# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:09-cr-00021 |
| v. | MEMORANDUM OPINION |
| BRANDEN ALTOMORRE WHITE, *Defendant.* | JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Branden White's Motion to Suppress Evidence (docket no. 21). For the reasons set forth in the following Memorandum Opinion, the Defendant's Motion to Suppress Evidence will be DENIED in an Order, to follow.

## I. BACKGROUND

### A. Factual Background

On the evening of March 31, 2009, the Charlottesville Police Department received "reports of shots fired," and at approximately 11:20 p.m.,[1] units were dispatched to the 700 block of Prospect Avenue in the Blue Ridge Commons housing development. While the units were en route, a further report notified the Police Department that someone had been shot, and was being driven to the hospital in a friend's car.[2]

---

[1] While the Government's Memorandum in Reply to Defendant's Motion to Suppress and the Report of Officer Derrick Dean (hereinafter Officer Dean or the Officer) indicate this occurred at 10:20 p.m., the testimony of Officer Dean at the October 13, 2009 suppression hearing, and the video recording from Officer Dean's patrol car, make clear that the events at issue occurred instead at approximately 11:20 p.m.

[2] From the record at present, it is unclear how many reports of shots fired were called in to the Police Department, whether such reports were accompanied by identifying information about the callers or nature of the incident, or whether the subsequent call that someone had been shot and was being transported to the hospital contained any corroborative pieces of information.

At the same time, Officer Dean, a uniformed police officer with the Charlottesville Police Department, was near the 600 block of Monticello Avenue on unrelated police business. Upon hearing the report of the shooting, Officer Dean began to drive to Prospect Avenue in his marked patrol car, intending to travel westbound along Elliott Avenue to 5th Street S.W., where a field abuts the rear of the Blue Ridge Commons development. As Officer Dean drove to Prospect Avenue, he testified that he saw four or five other people who were out on the street. Officer Dean stopped and talked to one individual who "appeared to duck behind some bushes" as he had driven past – asking him to take his hands out of his pockets and getting his identification – before releasing him when the call placed on the radio checked out.[3]

Following this, when Officer Dean reached the 100 block of Elliott Avenue, he saw an individual (later identified as Cordrick Dade) at the corner of Elliott Avenue and Ware Street. In the Officer's opinion and experience, he believed "[s]ufficient time had passed since the shooting that … someone involved in the shooting could have travelled to this location[.]" Government's Memorandum in Reply, at 2. This location is between .45 and .87 miles from 700 Prospect Avenue, the location at which it was reported that shots had been fired.[4] Officer Dean made a U-turn, pulled the patrol car up along the curb ahead of Mr. Dade, who had also been heading westbound. Officer Dean got out of the patrol car, stepped in front of Mr. Dade, and asked to see his hands because "somebody got shot." In the course of asking for Mr. Dade's identification and where he lived, Officer Dean stated that since the shooting, "it's been a few minutes now that's why we're out here

---

[3] There is no mention of this first stop in the briefing on the Motion to Suppress Evidence, however, Officer Dean so testified at the suppression hearing.

[4] The discrepancy in figures appears to be the result of whether this distance is calculated on the basis of one's travel by road, or travel through the field next to the Blue Ridge Commons development. Officer Dean testified that he believed this distance to be "within a quarter mile; between a quarter mile and a half mile." The distance from the field which abuts the rear of the Blue Ridge Commons development and 100 Elliott Avenue is approximately .45 miles. On the other hand, the Defendant's figure of .87 miles appears to have been the result of calculating the distance from 700 Prospect Avenue to 100 Elliott Avenue if one travels entirely by road. *See* Defendant's Memorandum, at 3.

canvassing the area." When Mr. Dade volunteered, "I don't fit the description[,]" Officer Dean responded: "No, there's no description. If I see anybody getting out here or anybody walking out here, I want to get out and see what they're doing, who they are …." During this interaction, Officer Dean stood on the sidewalk, and Mr. Dade was seated on a guardrail that ran along the side of the sidewalk furthest from the road.

At this point, the Defendant approached walking eastbound (from the direction of Blue Ridge Commons) on the same sidewalk toward Officer Dean and Mr. Dade. When he neared the two, the Defendant stepped off the sidewalk and onto the street (and around the parked police car) to walk around the area where the Officer and Mr. Dade were congregated. To Officer Dean, this action made it appear as if the Defendant were trying to avoid him. Officer Dean testified that he believed there was enough space between the patrol car and the sidewalk for the Defendant to have passed through, and that such a course of movement would not have made him suspicious that the Defendant was trying to avoid him.[5] In addition, the Officer could see a "visible sheen of sweat on [the Defendant's] brow," which was noticeable because light from the street lights was "glinting off his skin." The sweat drew Officer Dean's attention because he testified that "it was a cold night," and he estimated the temperature to be "between 30 and 40 degrees, if not lower." The Officer testified that the Defendant appeared to have "slightly elevated breathing," as if due to "physical exertion," or, as the Officer believed, "under the influence of adrenalin of some sort, fright, fear, fight or flight response." Finally, the Officer noticed that as the Defendant approached, his eyes "seemed overly large," and that his hands were in his pockets. When the Defendant walked around the patrol car, Officer Dean turned his flashlight on him and the following conversation transpired.

Officer: Come over here real quick man?

---

[5] However, Officer Dean testified later that he would have stopped the Defendant even under these circumstances.

[*Defendant walks up to the Officer*]

Officer:  Where you guys coming from?

Defendant:  I'm coming from getting off the bus … and I'm going home … off of work.

Officer:  Off the bus?  Where you working at?

Defendant: UVA.

Officer:  UVA?

Defendant:  Yeah.

Officer:  Keep your hands out of your pockets for me alright?  We had somebody get shot.  So they have me out here looking at people.

Defendant:  You know I'm trying to go home … I'm tired.

Officer:  I understand … hang tight for me alright?

[*Officer turns his attention back to the radio dispatcher*]

After concluding his encounter with Mr. Dade and telling him to have a good night, Officer Dean began asking the Defendant for his name, date of birth, at which stop he got off the bus, and where he worked.  The Defendant answered all of the aforementioned questions.  Officer Dean made the following observations during this series of questions:

> Defendant angled the right side of his body away from Dean, as if he were attempting to keep that part of his body out of the officer's line of sight. …. Dean observed Defendant's right arm and hand move down to the area of his right waist several times, as if checking to make sure something was still there.  Based on his training and experience as a police officer, Dean believed Defendant's actions to be consistent with the behavior of an individual carrying a concealed firearm without the benefit of a holster.  These observations caused Dean to be suspicious that Defendant was perhaps armed and may have been involved in the shooting that had just occurred.

– 4 –

Government's Memorandum in Reply, at 2-3.  After this series of questions, the following conversation transpired:

> Defendant:  Can I go home, please … man, I'm tired.
>
> Officer:  …Yeah, just a second.  I have to make sure you're not wanted.
>
> Defendant:  Oh yeah … got a job … no warrants … graduated high school and everything.
>
> Officer:  We don't know who did the shooting.  All we know is that it was done.

Officer Dean called in a warrant check to the dispatcher for the Defendant, which came up negative.  The Officer then asked whether the Defendant had any weapons on him, which the Defendant denied several times, and objected that Mr. Dade had not been subject to a pat down.  Officer Dean explained what the pat down entailed while conducting the brief pat down the outside of the Defendant's clothing.  According to Officer Dean, he "felt a rigid, cylindrical object running down Defendant's right thigh.  Based on his training and experience, Dean believed this object to be the barrel of a firearm."  Government's Memorandum in Reply, at 3.  When Officer Dean asked the Defendant what the object was, Defendant replied, "Nothing," and immediately fled.

Officer Dean pursued the Defendant and fired a taser, which missed.  As the Defendant ran away, he tripped and fell on the sidewalk, and a black revolver fell from his waist to the ground.  Officer Dean soon thereafter apprehended the Defendant and placed him in custody.  In a search incident to the arrest, Officer Dean found a "small quantity" of marijuana on the Defendant's person.

B. Procedural Background

On March 31, the Defendant was arrested by the Charlottesville Police Department and charged with four misdemeanors: (1) possession of a concealed weapon, in violation of Virginia Code § 18.2-308; (2) discharge of a firearm in a public place, in violation of Virginia Code § 18.2-280; (3) possession of a stolen firearm, in violation of Virginia Code § 18.2-108.1; and (4) simple possession of marijuana, in violation of Virginia Code § 18.2-250.1.

On June 10, 2009, the Defendant was indicted by the grand jury in the Western District of Virginia and charged in Count One with being an unlawful user of marijuana in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3), and in Count Two with simple possession of marijuana, in violation of 21 U.S.C. § 844, a misdemeanor.

On July 6, 2009, the state charges were dismissed, and the Defendant was arrested on the indictment. He had his initial appearance on July 7, 2009. On October 13, 2009 the Court held a suppression hearing. On October 16, the Defendant filed a Supplemental Memorandum in Support of Motion to Suppress Evidence that responded to an informal memorandum submitted by the Government at the suppression hearing, which had distinguished cases cited in Defendant's original Memorandum.

II. APPLICABLE LAW

The Fourth Amendment is not implicated in all interactions between law enforcement officers and private individuals. *See Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382 (1991) ("The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation."). A law enforcement officer can approach someone on the street, "ask[ ] him if he is willing to answer some questions," and can then "put[ ] questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319 (1983) (plurality opinion).

*See also United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008) (recognizing as insufficient to establish a seizure the mere fact that "a police officer seeks cooperation or information"). As a part of such a 'police-citizen encounter,' the law enforcement officer can identify himself as such without automatically turning the encounter into a seizure. *See Royer*, 460 U.S. at 497. The test for determining whether an encounter constitutes a 'seizure' whereby Fourth Amendment protection attaches, rather than a voluntary 'police-citizen encounter,' is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chestnut*, 486 U.S. 567, 573, 108 S.Ct. 1975 (1988); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989). Under *Florida v. Bostick*, the question is "whether a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter." *United States v. Farrior*, 535 F.3d 210, 218 (4th Cir. 2008) (citing *Bostick*, 501 U.S. at 439).

A law enforcement officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)). The Court, in making its inquiry on "reasonable, articulable suspicion," will look to the "totality of the circumstances" to determine "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002). In so doing, the Court will credit "the practical experience of officers who observe on a daily basis what transpires on the street," *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993), and "must give 'due weight' to [the] factual inferences" drawn by the officers. *Arvizu*, 534 U.S. at 273-74 (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657 (1996)). It is clear that an officer may not rely upon a "mere hunch," *Arvizu*,

534 U.S. at 274, or an uncorroborated anonymous tip to constitute a "reasonable, articulable suspicion." *See e.g.*, *United States v. Jones*, 242 F.3d 215, 218-19 (4th Cir. 2001). Among the factors that have been recognized as properly contributing to a finding of reasonable suspicion are: (1) whether the seizure occurs in a "high crime area," *Black*, 525 F.3d at 365; (2) tips or information from an anonymous or known source, *United States v. Perrin*, 45 F.3d 869, 872 (4th Cir. 1995); (3) lateness of the hour, *Lender*, 985 F.2d at 154; (4) "evasive conduct," *United States v. Tate*, 648 F.2d 939, 942 (4th Cir. 1981) (attempt by suspects to hide their faces); and (5) "nervous" conduct. *United States v. Mayo*, 361 F.3d 802, 805-06 (4th Cir. 2004) (citing *United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir. 1993) (identifying as "unusually nervous" such behavior as shaking hands, heavy breathing, and providing inconsistent answers)).

In the course of such a seizure (known as an "investigative stop" or a *Terry* stop), if the law enforcement officer is "presented with a reasonable belief that the person may be armed and presently dangerous," the officer may conduct a protective frisk. *Black*, 525 F.3d at 364. However, if the officer did not possess the requisite reasonable suspicion of criminal activity for a *Terry* stop, "a police officer may not simply approach a citizen, as part of a police-citizen encounter, and frisk the citizen because the officer believes that his safety is at risk." *Mayo*, 361 F.3d at 807.

### III. DISCUSSION

#### A. Fourth Amendment Seizure Question

Applying the law to the facts before the Court, I do not find the Defendant's arguments to be persuasive that the Defendant was seized prior to the point at which Officer Dean told the Defendant that he was going to pat him down for weapons.

After conducting an *in camera* review of the police video that captured the encounter between Officer Dean and the Defendant on March 31, 2009, and hearing the testimony of Officer

Dean on October 13, 2009 at the suppression hearing, I find the following facts to have been established. As the Defendant approached Officer Dean, the Defendant stepped off the sidewalk and onto the street (around the parked police car) to walk around the area where Officer Dean and Mr. Dade were congregated. When he did this, Officer Dean, who had been communicating on his radio, turned the flashlight toward the Defendant and the following exchange took place:

> Officer: Come over here real quick man?
>
> [*Defendant walks up to the Officer*]
>
> Officer: Where you guys coming from?
>
> Defendant: I'm coming from getting off the bus … and I'm going home … off of work.
>
> Officer: Off the bus? Where you working at?
>
> Defendant: UVA.
>
> Officer: UVA?
>
> Defendant: Yeah.
>
> Officer: Keep your hands out of your pockets for me alright? We had somebody get shot. So they have me out here looking at people.
>
> Defendant: You know I'm trying to go home … I'm tired.
>
> Officer: I understand … hang tight for me alright?
>
> [*Officer turns his attention back to the radio dispatcher*]

The Defendant contends that this exchange (which will be referred to as the "Initial Encounter") constituted a seizure under the Fourth Amendment. He argues that "[b]ased on the totality of the circumstances, White was seized when the officer commanded him stop, 'Come over

here real quick,' and 'keep your hands out of your pockets.' A reasonable person would not have felt free to terminate the encounter and leave." Defendant's Memorandum, at 11.

In order to determine whether a particular encounter with a police officer constitutes a seizure, the Court begins its analysis by reviewing a non-exhaustive list of factors articulated by the Fourth Circuit as pertinent to this inquiry, such as "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002). In order for a seizure to occur, "any restraint of movement will do, including a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way." *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (internal citations and quotation marks omitted). The Court notes at the outset that the weight of the Defendant's argument appears to rest upon the impact that Officer Dean's words, tone, and demeanor would have on a reasonable person, rather than upon the other aforementioned factors.

One important factor frequently looked to by courts when determining whether an officer displayed such a "show of authority" that an individual was effectively seized, is "whether the officer touched the defendant or made any attempt to physically block his departure or restrain his movement." *Gray*, 883 F.2d at 322 (citing *United States v. Aguilar*, 825 F.2d 39, 40 (4th Cir. 1987)). *See also United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir. 1993) (citing as evidence in favor of a consensual police-citizen encounter the fact that "the officers never blocked or stood in front of" the defendant as he was walking with them). Officer Dean did not physically touch the Defendant at any point during this encounter until much later when he began to conduct the pat down. Furthermore, Officer Dean did not physically attempt to restrain the Defendant's movement

by, for example, stepping out in front of the Defendant. In fact, the evidence shows that Officer Dean merely turned toward the Defendant as he walked around the patrol car, but did not change his position on the sidewalk. The Court also finds that several other factors that generally contribute to a finding that an individual was seized for Fourth Amendment purposes, namely the presence of multiple officers and whether an officer had drawn his firearm, are not implicated under the present circumstances. *See United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992) (noting that "[a]lthough [Officer] Parker was accompanied by officer McCoy," the voluntary nature of the encounter was supported by the fact that "neither had his gun drawn"); *Gray*, 883 F.2d at 322 (citing presence of multiple officers, and whether an officer drew his firearm, as pertinent factors to this inquiry). No other officers were present with Officer Dean during his encounter with the Defendant, and at no point during this encounter did Officer Dean draw his firearm.

The Defendant contends that during this Initial Encounter, the words employed by Officer Dean, and his accompanying tone and demeanor, would convey to a reasonable person that they were not free to leave, or otherwise ignore the Officer's requests. The question therefore is whether the language or tone employed by Officer Dean was such that it would "indicat[e] that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980). Before addressing the Officer's tone and demeanor, the Court will first address the import of the specific words used by Officer Dean in this Initial Encounter.

In *United States v. Black*, the Fourth Circuit was recently confronted with the question of whether an individual was seized for the purposes of the Fourth Amendment when officers repeatedly asked him to take his hand out of his pocket. 525 F.3d 359 (4th Cir. 2008). In that case, officers patrolling a high-crime area in a marked patrol car approached a group of four or five people who were congregated near a building that displayed "No Trespassing" signs. As the officers

neared, the individuals immediately disbursed. The defendant had been standing approximately thirty feet apart from the group when the officers exited their vehicle and one detective asked him, "Hey man, do you live out here?" The defendant turned and responded with his address, at which point one of the officers turned his flashlight on the defendant's midsection and noticed his right hand "awkwardly inserted halfway in his right coat pocket as if grabbing an object." *Id.* at 361. The officer, concerned that the defendant might possess a firearm, asked, "Can you take your hand out of your pocket?" The defendant made no physical or verbal response, but when the officer repeated the request, the defendant removed his hand from his pocket. At this point, the detective saw a bulge in the defendant's pocket that appeared to be in the shape of a firearm. The officer asked the defendant several times what was in his pocket, and when the defendant put his hand back in his pocket, the officer "became nervous," "placed his hand on his gun and said 'Take your hand out of your pocket. I don't want to have to shoot you.'" *Id.* at 362.

The court found, and neither party contested, that the encounter between the defendant and the officer began as a consensual encounter. *Id.* at 364. However, the court held that it was only when the officer "put his hand on his own gun," told the defendant "Take your hand out of your pocket. I don't want to have to shoot you," and then "ordered [the defendant] to move to the police car" was the defendant effectively seized for Fourth Amendment purposes. *Id.* at 365. By holding that the seizure only occurred at this point and not sooner, the Fourth Circuit in *United States v. Black* implicitly held that the request from an officer to remove one's hand from one's pocket, and even a repeated request, was, without more, insufficient to effectuate a seizure. *See also United States v. Adebanjo*, 54 F.3d 774 (4th Cir. 1995) (table) (per curiam) (concluding that the defendant was not seized when the officer told him "to remove his hand from his jacket" because at the time, the defendant "was free to leave; his movement was not restricted, nor was his liberty restrained").

In light of such precedent, the Court weighs the effect that the Officer's words ("Keep your hands out of your pockets for me alright?") would have had on a reasonable person in light of the totality of the circumstances, but will not attribute special significance to such words, as if they would effectuate a *per se* seizure.

A related factor for the Court to consider in determining whether a reasonable person would feel free to leave the encounter with the officer is the officer's tone of voice. *See e.g.*, *United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992); *United States v. Gray*, 883 F.2d 320, 322-23 (4th Cir. 1989) (finding as one factor "most frequently looked to by the courts" is whether "the officer's questioning was 'conversational' rather than 'intimidating' i.e., did the officer raise his voice or threaten the defendant"). Of particular importance to the Defendant's claim that a reasonable person would not have felt free to leave encounter with Officer Dean, is the characterization of the Officer's tone as a command, rather than a question or a request. *See e.g.*, Defendant's Memorandum, at 9 ("When White reached the front of the car, the officer did not 'request' White to answer questions, he *commanded* him to stop: 'Come over here real quick man.'"). After conducting an *in camera* review of the police video that captured this encounter and hearing the testimony of Officer Dean on October 13, 2009, I find that the Officer did not physically or verbally threaten the Defendant at any point in their conversation. Despite the Defendant's characterization of the Officer's words as commands, when the Officer said "Come over here real quick man?" and "Keep your hands out of your pockets for me alright?" to Defendant, they were clearly said in the form of questions, rather than commands. Furthermore, the Officer's tone remained conversational throughout this encounter with the Defendant.

The Defendant also argues that the encounter between Officer Dean and Mr. Dade, as apparent when one approached them on the sidewalk, would contribute to a reasonable person's

belief that he was not free to terminate an encounter with Officer Dean.  Defendant argues that as he approached, he saw "[t]he man was sitting on the guard rail in a submissive position while the officer stood up, shining his flashlight at the man and asking him questions.  By all appearances the man was being detained and questioned by the officer."  Defendant's Memorandum, at 9.  While it may have appeared that Officer Dean was asking the man questions, that he had the man's identification and was radioing for more information, none of this necessarily implies that man was not voluntarily cooperating with the Officer.  An officer's retention of a citizen's identification is "highly material under the totality of the circumstances analysis," but it does not automatically convert an otherwise consensual encounter into a seizure.  *United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002).  Furthermore, even had Officer Dean seized or arrested Mr. Dade within eyeshot of the Defendant, it would not have resulted in the Defendant's own seizure.  *See United States v. Drayton*, 536 U.S. 194, 206, 122 S.Ct. 2105 (2002) ("The arrest of one person does not mean that everyone around him has been seized by the police.").  In *Drayton*, the Supreme Court found that even after defendant Drayton witnessed co-defendant Brown (who was seated beside him on a bus) placed under arrest as a result of a patdown, his subsequent consent to a patdown was voluntary, in light of the fact that the officer addressed the defendant "in a polite manner and provided him with no indication that he was required to answer [the officer's] questions."  *Id.*  Under the present circumstances, the Court finds the encounter between Officer Dean and Mr. Dade to be of only marginal significance to Defendant's claim that the Initial Encounter constituted a seizure.  The Defendant would have noticed that Officer Dean was polite as he concluded his encounter with Mr. Dade, telling him "Thank you Mr. Dade, you have a nice night."  The Officer was similarly polite and conversational as he then turned his attention to the Defendant.

Therefore, in light of the aforementioned reasons and considering the totality of the

circumstances, I find the Initial Encounter between the Defendant and Officer Dean constituted a voluntary police-citizen encounter, and was not a seizure within the meaning of the Fourth Amendment.

Defendant argues that even if the Court did not find the Initial Encounter to be a seizure, their subsequent conversation prior to the point at which Officer Dean told the Defendant he was going to pat him down, or the so-called "Continued Encounter," was a seizure. "It is clear from White's statements ('I'm trying to go home,' 'Can I go home, please?') that he felt that he was not free to leave and that he needed the officer's permission. Dean could not have interpreted these statements as anything other than an indication that White wanted to terminate the encounter and continue on his way home, but that he needed the officer's permission to leave." Defendant's Memorandum, at 12. It appears that the Defendant argues the Continued Encounter constituted a seizure when the following exchange took place.

> Defendant: Can I go home, please … man, I'm tired.
>
> Officer: … yeah, just a second. I have to make sure you're not wanted.
>
> Defendant. Oh yeah … got a job … no warrants … graduated high school and everything.

This exchange poses a closer question than the Initial Encounter, but it too falls short of a seizure. Contrary to Defendant's assertion that "Dean *denied permission*, saying that before he would allow White to leave he would 'have to make sure you're not wanted,'" Defendant's Memorandum, at 12 (emphasis added), Dean's response could also be taken to mean that, "yeah," the Defendant could go home, but the Officer requested "just a second" of the Defendant's time "to make sure [he was] not wanted." As stated previously, in determining whether an individual has

been seized for the purposes of the Fourth Amendment, the question is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975 (1988); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989). Asking an officer whether one is free to leave, or whether one can go home, does not necessarily transform an otherwise voluntary police-citizen encounter into a seizure, and it must be judged by the parties' subsequent words and conduct. *See e.g.*, *United States v. McFarley*, 991 F.2d 1188, 1190-92 (4th Cir. 1993) (finding a voluntary encounter where defendant asked, "Am I free to leave?" to which the officer responded affirmatively, and when the officer "stated that he was going to walk with him," the defendant said, "That's fine"); *United States v. Wilson*, 953 F.2d 116, 118-22 (4th Cir. 1991) (finding a seizure where defendant asked several times, "if [the officers] were stopping him," to which they replied, "no, he was free to leave," but the officers persistently followed and questioned him over an extended period of time). The court in *Wilson* held that "[t]he coercive effect of the policemen's actions must be evaluated in light of [the individual's] response." 935 F.2d at 122. As such, the Court will not view the two initial statements in isolation, and finds particularly relevant the Defendant's candor in his response: "Oh yeah … got a job … no warrants … graduated high school and everything." Perhaps recognizing that a warrant check would turn up negative, Defendant may have felt that continuing to cooperate with Officer Dean at this point, rather than terminating the heretofore voluntary encounter, would be in his best interests. *Cf. McFarley*, 991 F.2d at 1192 ("While McFarley perhaps felt that cooperation in the questioning would be most beneficial to him in deflecting suspicion, that purpose cannot form the basis for later claiming that the encounter was non consensual.").

Therefore, in light of the aforementioned reasons and considering the totality of the circumstances, I find that the Continued Encounter (as articulated by the Defendant) between the

Defendant and Officer Dean similarly constituted a voluntary police-citizen encounter, and was not a seizure within the meaning of the Fourth Amendment.[6]

It was not until Officer Dean made the following statement to the Defendant that the voluntary police-citizen encounter was transformed into a seizure. "Now I'm just going to pat you up through your pockets. Got to make sure you don't have any weapons on you …." At this point, the language and tone employed by Officer Dean clearly "indicat[e] that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980). The Officer's language was not framed as a question or as a request that the Defendant submit to a patdown, but instead it was framed as a positive statement as to what was going to happen. Furthermore, the Officer immediately thereafter began to conduct the patdown and thereby touched Defendant's person in spite of the fact that the Defendant had protested the patdown by saying "I don't have any weapons … you didn't pat him down." At the point at which Officer Dean told the Defendant he was going to pat him down, the voluntary police-citizen encounter was transformed into a seizure, and Fourth Amendment protection attached to the encounter.

B. Reasonable Suspicion for a *Terry* Stop

Although I have determined that the encounter between Officer Dean and the Defendant was a consensual 'police-citizen encounter' until the point at which Officer Dean told the Defendant he was going to pat him down, that is not the end of the inquiry. A police officer may stop and detain an individual for investigative purposes without violating the Fourth Amendment's prohibition against unreasonable searches and seizures when the officer possesses "a reasonable and articulable suspicion," based on specific facts, that criminal activity is afoot. *United States v. Sokolow*, 490

---

[6] Even if the Continued Encounter did transform an otherwise voluntary police-citizen encounter into a seizure, as described below, Officer Dean's actions were adequately supported by a reasonable suspicion at that point and the Defendant's Motion to Suppress Evidence would still be denied.

U.S. 1, 7, 109 S. Ct. 1581 (1989); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868 (1968); *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005). Although reasonable suspicion is a less demanding standard than probable cause, "[t]he officer … must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7. Whether reasonable suspicion exists depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744 (2002). In making this assessment, "context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). As a result, judicial analysis of the facts offered to support reasonable suspicion "must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Id.* at 337.

Applying these principles to the Defendant's case, I find that Officer Dean had the requisite reasonable, articulable suspicion that criminal activity was afoot with respect to the Defendant by the time he told the Defendant that he was going to pat him down, and thus the Defendant had been seized. However, even if the Defendant had been seized upon the aforementioned Continued Encounter, as argued by the Defendant, the Officer still possessed such a reasonable suspicion by that point justifying a seizure.

The inquiry into whether Officer Dean possessed the requisite "reasonable suspicion" that criminal activity was afoot with respect to the Defendant must be viewed against the backdrop of the parties' proximity to the location where it was reported that shots were fired.[7] As stated previously,

---

[7] The Court relies upon the "reports of shots fired" as supporting Officer Dean's reasonable suspicion with respect to Defendant's proximity to the location of the alleged crime, but not as supporting a suspicion based upon Defendant's identity that he was involved in the shooting. Officer Dean recognized as much when he told the Defendant that he did

Officer Dean approached the area intending to travel along Elliott Avenue to 5th Street S.W. where a field abuts the rear of the Blue Ridge Commons housing development. To the Officer, "[s]ufficient time had passed since the shooting that [he] … believed it possible that someone involved in the shooting could have travelled to this location on the 100 block of Elliott Avenue." Government's Memorandum in Reply, at 2. This field would have been approximately .45 miles from the location where Officer Dean encountered the Defendant,[8] and according to the police video, the encounter occurred at 11:30 (approximately ten minutes after the initial report of shots-fired). That the Defendant was found walking in the vicinity of the Blue Ridge Commons housing development – and at a distance of several blocks if one assumes (as Officer Dean did) a suspect might cut across the field abutting the rear of the development – contributed to the Officer's reasonable suspicion of the Defendant that justified a *Terry* stop and frisk. *See United States v. Calloway*, 943 F.2d 50, at *2 (4th Cir. 1991) (table) (per curiam) (finding the fact that defendant "was just a few blocks from the scene" of a reported crime, in addition to other reliable indicia implicating defendant, contributed to officer's reasonable suspicion). *See also United States v. Davenport*, 303 F. App'x 42, 43-44 (2d Cir. 2008) (citing as a factor contributing to reasonable suspicion the defendant's "location in the vicinity of the recently committed crime"). Furthermore, when the Defendant approached Officer Dean, he had been walking from the direction of the Blue Ridge Commons housing development. While the Defendant's proximity to the reported shots-fired incident (in terms of distance, time elapsed, and direction of travel) would likely be insufficient on its own for a finding of "reasonable

---

not know who did the shooting, and when he later testified that he had no description of the alleged shooter. Besides establishing the location of the shooting from which to determine Defendant's proximity, the Court recognizes that the value of such reports is limited in this case, and that they are distinguishable from the more detailed anonymous tips found to a support a reasonable suspicion. *See e.g.*, *United States v. Perkins*, 363 F.3d 317, 319 (4th Cir. 2004) (anonymous report from woman whom officer reasonably believed he could identify, complaining of "two white males in the front yard" of a particular residence "who were pointing and displaying rifles in various directions"); *United States v. Sims*, 296 F.3d 284, 285 (4th Cir. 2002) (anonymous report that "a black male wearing a T-shirt and blue jeans had just fired a pistol in the area of" a particular residence).

suspicion," it is properly considered as a factor *contributing to* such a finding. While the Court finds the proximity of the investigatory stop to the location of the shooting to contribute to Officer Dean's reasonable, articulable suspicion, it does not weigh in on whether other characteristics of the neighbourhood would support such a suspicion.[9]

Whether the Defendant has engaged in "evasive conduct" is of importance in determining the legality of a *Terry* stop, and is of considerable importance under the present facts. First, the Government has argued and Officer Dean so testified that when the Defendant "walked off of the sidewalk and out into the street in order to walk around both the officer and the officer's vehicle" it appeared to Officer Dean that the "Defendant was attempting to avoid him." Government's Memorandum in Reply, at 2. Based upon a review of the police video and with reference to Defendant's exhibits, the Court finds that the Defendant's actions *could have been* innocent in nature, however it also recognizes that the Court "must give 'due weight' to [the] factual inferences" drawn by law enforcement officers. *Arvizu*, 534 U.S. at 273-74. As Officer Dean stood on the sidewalk facing the direction of the Defendant as he approached, he was in the best position to determine whether the Defendant's behavior appeared to be evasive. Even though the Defendant's path of travel could have had an innocent explanation, in connection with other circumstances of the

---

[8] *See supra*, note 4.

[9] One factor that is often considered in determining whether there is reasonable suspicion to make an investigatory stop is whether it occurred in a "high crime area." *See e.g.*, *United States v. Black*, 525 F.3d 359, 365 (4th Cir. 2008). It is true that the finding that a particular area constitutes a "high crime area" need not be an all-or-nothing proposition, and "the high-crime-area factor, like most others, can be implicated to varying degrees." *United States v. Swain*, 324 Fed. App'x 219, 222 (4th Cir. 2009) (unpublished). However, as stated previously, it is unclear from the record at present whether the 100 block of Elliott Avenue can be considered a "high crime area." The Defendant has argued that it is not a "high crime area," and the Government has not addressed the issue. Without further findings of fact on this issue at the hearing, this factor will not be considered to support a reasonable suspicion for an investigatory stop. *See e.g.*, *United States v. Dupree*, 2009 WL 1475276, at *5 n.45 (E.D. Pa. 2009) ("The Government has presented no evidence [as to whether an area is a high crime area], and while the Court has certain generalized knowledge as to the reputation of some areas of the City of Philadelphia for a high crime rate, it declines to inject a finding *sua sponte* in this case on the same.").

encounter, this contributed to Officer Dean's reasonable suspicion of the Defendant. *See Black*, 525 F.3d at 365 (stating that "[a] reasonable suspicion need not rule out all innocent explanations").

The second, and in the Court's opinion, more persuasive instance of evasive behavior justifying reasonable suspicion concerns the Defendant's attempt at angling the right side of his body away from Officer Dean. This posture, which Officer Dean characterized as "blading," signalled to him that the Defendant was trying to keep the right side of his body out of sight, comparable to when one "presents a smaller target in a shooting situation." Officer Dean testified that the Defendant began "blading his body away from him" after he asked the Defendant to remove his hands from his pockets. Officers are trained to notice such conduct as "blading," which regularly supports an officer's reasonable suspicion that criminal activity is afoot, justifying a seizure. *See United States v. Collins*, 272 F. App'x 219, 222 (4th Cir. 2007) (unpublished). In addition to blading the right side of his body away from Officer Dean, at the suppression hearing Dean testified that he "observed that [the Defendant's] right hand and arm would go down to the weight area of his side on his right side. Looked like he was trying to feel and make sure something was still there, to me." An individual's hand placement in his pockets, or against one's clothing, in a manner that is consistent with one's carrying a firearm without the benefit of a holster, is regularly found to support an officer's reasonable suspicion justifying a seizure. *See e.g.*, *Black*, 525 F.3d at 365 (defendant "had his left hand out of his pocket and his right hand awkwardly inserted halfway in his right-hand pocket, 'cupped' as if 'grasping an object'"); *Mayo*, 361 F.3d at 807 (defendant placed his hand in pocket in a way that "suggested to the officers that Mayo had put his left hand onto a gun to protect it while he was moving"); *United States v. Swain*, 324 F. App'x 219, 224 (4th Cir. 2009) (unpublished) (per curiam) ( defendant removed and replaced his hands in his pockets several times after being told to take them out of his pockets by an officer); *United States v. Diggs*, 267 F. App'x

225, 226 (4th Cir. 2008) ("defendant put his hand in his pocket and appeared to be supporting something heavy"). Officer Dean testified to his training in the academy and to subsequent specialized training he received in the area of firearms interdiction. Based upon the factors mentioned, and in light of his training, Officer Dean became suspicious that the Defendant may be armed.

Finally, in addition to the Defendant's proximity to the reported crime, and his evasive behavior, the Court notes the Defendant's nervous behavior further supported Officer Dean's reasonable suspicion that criminal activity was afoot. Officer Dean testified that the Defendant appeared to have "slightly elevated breathing," as if due to "physical exertion," or, as the Officer believed, "under the influence of adrenalin of some sort, fright, fear, fight or flight response," and he testified that as the Defendant approached, his eyes "seemed overly large." Also, Officer Dean testified that he could see a "visible sheen of sweat on [the Defendant's] brow," which was noticeable because light from the street lights was "glinting off his skin." From this testimony, it appears that the Officer made two inferences: (1) that these were signs that the Defendant was nervous upon encountering Officer Dean; and (2) that these were signs that the Defendant had been physically exerting himself, such as by running. Characteristics such as these are the quintessential examples of nervous behavior that support law enforcement officers' reasonable suspicion of criminal activity. *See e.g.*, *Mayo*, 361 F.3d at 804 (finding reasonable suspicion based in part on defendant's nervous behavior, where his "eyes were extremely wide, his mouth was slightly agape" and his shirt was "fluttering … as though he was shaking"); *United States v. Johnson*, 929 F.2d 695, at *2 (4th Cir. 1991) (table) (unpublished) (finding reasonable suspicion based in part on fact that the defendant "appeared to be sweating, shaking and nervous"). Furthermore, even if the fact that Defendant appeared to be sweaty, breathing heavily and otherwise appeared to be under the effects

of adrenaline was susceptible of an innocent explanation, the combination of factors still gave rise to Officer Dean's reasonable suspicion that criminal activity was afoot with respect to the Defendant. *See Black*, 525 F.3d at 365-66 ("Even where each individual factor 'alone is susceptible of innocent explanation,' the question is whether, '[t]aken together,' they are sufficient to 'form a particularized and objective basis' for an officer's suspicions.") (citing *Arvizu*, 534 U.S. at 277).

Therefore, taking these facts together and under the totality of the circumstances, I find that Officer Dean possessed the requisite reasonable suspicion that the Defendant had a firearm in his pocket, in violation of Virginia law, or that criminal activity was afoot with respect to the Defendant, and therefore the investigatory stop was justified at the point upon which it was conducted. As stated previously, I found that Officer Dean seized the Defendant when he told him that he was going to conduct a pat down. However, even assuming *arguendo* that the Continued Encounter (as argued above by the Defendant) transformed the voluntary police encounter into a seizure, Officer Dean still possessed the requisite reasonable suspicion at that point as well. All of the aforementioned factors supporting the Officer's reasonable suspicion, *i.e.* the Defendant's proximity to the location of the reported crime, his path of travel around Officer Dean, his "blading" the right side of his body away from Officer Dean, his suspicious placement of his right hand in a manner which suggested he was checking to make sure something was still there, his heavy breathing and sweaty brow, and otherwise looking like he was under the effects of adrenaline, were present by that point in time as well.

Lastly, in the course of a seizure, if the law enforcement officer is "presented with a reasonable belief that the person may be armed and presently dangerous, an officer may conduct a protective frisk." *Black*, 525 F.3d at 364. The aforementioned reasons which justified the seizure

similarly presented Officer Dean with such a reasonable belief that the defendant may be armed and presently dangerous and therefore justified protective frisk.

## IV. CONCLUSION

For the aforementioned reasons, I find that the encounter between Officer Dean and the Defendant was a consensual and voluntary police-citizen encounter. The point at which it had developed into a seizure was when Officer Dean told the Defendant that he was going to pat him down, and by that point the stop and frisk was supported by a reasonable, articulable suspicion that the criminal activity was afoot with respect to the Defendant. Even assuming that the voluntary encounter was transformed into a seizure earlier when Officer Dean told the Defendant "yeah, just a second. I have to make sure you're not wanted," the seizure was similarly supported by reasonable, articulable suspicion at that point as well. Therefore, the Defendant's Motion to Suppress Evidence will be DENIED, in an Order to follow.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record and to the Defendant.

Entered this 17th day of November, 2009.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE